# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DENNIS THOMAS,<br><br>      Plaintiff,<br><br>v.<br><br>GEORGIA PACIFIC CORPORATION and METROPOLITAN LIFE INSURANCE COMPANY,<br><br>      Defendants. | Case No. 05-CIV-357-RAW |

## OPINION AND ORDER

Plaintiff filed this suit to recover benefits and enforce his rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, et seq. ("ERISA"). He challenges the decision by the Defendant to terminate his long term disability benefits under the Georgia Pacific Corporation ("GPC") Long Term Disability Plan ("the Plan"). The Court is indebted to both parties for their excellent exposition of the law and the facts in their respective briefs.

## THE FACTS

GPC is the sponsor and administrator of the Plan. The long term disability benefits provided under the Plan are funded by contributions by GPC and by contributions from participants. Employee contributions are transferred to a trust. Plan contributions are transferred to and benefits are paid from the Georgia Pacific Master Trust for Health and Welfare Benefit Plans. As the Plan Administrator, GPC has the exclusive responsibility and

complete discretionary authority to control the operation and administration of the Plan, including the power to construe the terms of the Plan and to determine eligibility for benefits. GPC has delegated to Metropolitan Life Insurance Company ("Met-Life"), the third party administrator ("TPA") for the Plan, the administrative and interpretive discretion to adjudicate long term disability claims and appeals under the Plan's claim procedure.

The Plan provides that a participant must provide proof of disability. If satisfactory documentation of disability is not provided, Met-Life will deny the claim. The Plan also provides that a participant may appeal the denial of a claim. Met-Life's decision on the appeal is final. A participant may not appeal from Met-Life to GPC. Thus, GPC has no decision making authority on any individual claim for benefits under the Plan.

Met-Life's duties as a TPA are governed by the Administrative Services Agreement[1] it has entered into with GPC. The Agreement provides for various fees to be paid by GPC to Met-Life for the services rendered by Met-Life in administering the Plan. Basically, those fees are based upon a monthly fee per employee enrolled in the plan. Met-Life's compensation under the Agreement is thus not based in any way upon its decisions to deny or award benefits under the Plan.

The Plan itself has a variety of standard provisions that are often seen in these cases. It provides for twenty-four months of benefits if a participant is disabled from working at his

---

[1] Previously, on its own initiative, the Court sua sponte ordered the Defendants to produce the Agreement in order to determine the existence of any conflict of interest. The Court intends, in all similar ERISA cases, to require such agreements be made part of the administrative record.

own occupation ("own-occ benefits"). After that first twenty-four months, a participant is entitled to continue benefits only if he proves he is disabled from working at any gainful occupation ("any-occ benefits"). An "elimination period" exists before any benefits are payable to a disabled participant.

Plaintiff was a forty-four year old man employed by GPC as a rewind operator from August 24, 1992 to his last day of work on April 24, 2002. A rewind operator is a medium level position, and the physical demands of the job required frequent lifting and carrying of twenty-five pounds and occasionally fifty pounds.

In 2000, Plaintiff was diagnosed with neuropathy in his wrists. He underwent ulnar surgery in 2001. He was released to return to work with no restrictions after the surgery; however, he was rated as having a twelve percent permanent partial impairment to each arm as a result of the neuropathy.

The parties have fully and exhaustively briefed the many, various and evolving medical conditions of the Plaintiff. The Court sees no need to detail them at length here. Nonetheless, Plaintiff's current problems seemed to originate with a tick bite he suffered on April 24, 2002, after which he never returned to his job at GPC. He suffered from fever, fatigue, nausea, headache, back pain, and hematuria. While he sought medical attention, all tests performed to detect active disease process were negative. Evidence in the record suggests that over the next few years, Plaintiff's medical conditions included: degenerative spinal disc disease, requiring lumbar fusion surgery; insulin dependent diabetes mellitus with

neuropathy; hypertension; heart disease; and chronic back and leg pain. The parties dispute which of these ailments actually contributed to Plaintiff's period of disability.

On May 10, 2002, Plaintiff submitted a claim for disability benefits along with a attending physician statement supporting his assertion that he was unable to work. After Plaintiff satisfied the requisite elimination period, Met-Life informed him that he was awarded any-occ disability benefits beginning September 25, 2002. From the time Plaintiff first submitted his claim for benefits, he saw a variety of doctors for chronic pain management and degenerative disc disease. He eventually underwent lumbar fusion surgery.

Met-Life accumulated a great number of medical records from the Plaintiff during the course of his medical treatment. The medical records were reviewed a number of times by board-certified physicians retained by Met-Life for the purposes of reviewing claims for benefits. Plaintiff also underwent a Functional Capacity Evaluation which demonstrated that he had the ability to perform a medium classification position for an eight hour day. Plaintiff's treating physicians believed he was disabled, while Met-Life's reviewing physicians believed there was insufficient objective evidence of neuromuscular disability to justify a finding of continued disability. On September 8, 2004, nearly two years after first being awarded benefits, Plaintiff was informed by Met-Life that he no longer met the

definition of own-occ disability under the Plan.[2]  Plaintiff appealed the decision, which Met-Life eventually affirmed.  Plaintiff has exhausted all administrative remedies.

## ANALYSIS

### I.  Standard of Review

Plaintiff filed suit alleging that the Defendant violated 29 U.S.C. § 1132 in terminating his LTD benefits.  When a court reviews a denial of benefits allegedly due under an ERISA plan, the default standard of review is de novo.  When a plan gives the claims administrator discretionary authority, however, a challenge under Section 1132 is to be reviewed under an arbitrary and capricious standard of review.  Firestone Tire & Rubber Co., v. Bruch, 489 U.S. 101, 115 (1989).  Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.  Id.

Under the two-tier "sliding scale" approach adopted by the Tenth Circuit, a "reduction in deference is appropriate" where there is an inherent or proven conflict of interest.  Fought v. Unum Life Ins. Co. of America, 379 F.3d 997, 1006 (10th Cir. 2004).  If plaintiff proves a conflict of interest, deference to the administrator's decision is reduced and the burden shifts to the administrator to prove that its interpretation of the terms of the plan is reasonable

---

[2]  It is interesting, but perhaps not particularly relevant, that Met-Life did not wait a couple of weeks and find that Plaintiff did not meet the criteria for any-occ disability.  Under the present record, such a determination would have been less susceptible to attack.

and that its application of those terms to the claimant is supported by substantial evidence. Id.

In a conflict of interest situation, the determinative inquiry is whether the administrator's decision was supported by substantial evidence. "'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.'" Sandoval v. Aetna Life and Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992) (citations omitted). "The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." Allison v. UNUM Life Insurance Co. of America, 381 F.3d 1015, 1022 (10th Cir. 2004). The Court considers the record as a whole, but it considers only that information available to the plan administrator at the time the decision was made.[3] Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002); Chambers v. Family Health Plan Corp., 100 F.3d 818, 823 (10th Cir. 1996) ("The reviewing court may consider only the evidence that the administrators themselves considered."). The Court must "take into account whatever in the record fairly detracts from the weight of the evidence in support of the administrator's decision." Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994) (internal citations and

---

[3] The Court has previously denied Plaintiff's motion to include in the administrative record a finding by a Social Security Administration ALJ that Plaintiff was disabled. Met-Life did not obtain or consider that determination in reaching its decision.

quotation marks omitted). The Court gives less deference to an administrator's conclusions if the administrator fails to gather or examine relevant evidence. See Caldwell v. Life Ins. Co. of North America, 287 F.3d 1276, 1282 (10th Cir. 2002). Yet, the Court "will not set aside [an administrator's] decision if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co., Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).

Conversely, if no conflict of interest is proven, the "pure" arbitrary and capricious standard is "a difficult one for a claimant to overcome." Nance v. Sun Life Assur. Co. of Canada, 294 F.3d 1263 (10th Cir. 2002).

> When reviewing under the arbitrary and capricious standard, the Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [the Administrator's] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on *any* reasonable basis. The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness – even if on the low end.

Id., at 1269.

In the present case, the money used to pay claims to eligible participants belongs primarily to GPC. Nevertheless, GPC plays absolutely no role in adjudicating claims for disability benefits. This is not a situation often encountered where the initial stages of adjudication and appeals are handled by a TPA, but the final appeal is determined by the plan

7

sponsor. Here GPC has effectively insulated itself from all aspects of the decision making process, and therefore insulated itself from any claims of conflict of interest.

Likewise, while Met-Life is the final decision maker with regard to a participant's eligibility for benefits, Met-Life has no financial stake in the outcome of its decision. Met-Life is not paying out its own assets to satisfy claims. Met-Life is compensated for its administrative duties with a monthly per participant fee. Thus, Met-Life has also effectively insulated itself from any allegations of a conflict of interest. In short, a third party administrator arrangement, where the claims adjuster is not paying claims with its own assets, is a near perfect mechanism for avoiding both the actuality and appearance of a conflict of interest in the claims adjudication process.

Predictably, Plaintiff thinks otherwise. Plaintiff's syllogism proceeds as follows: GPC's money is paid out in claims. GPC pays Met-Life to adjudicate the claims. Therefore, Met-Life will do GPC's unspoken bidding and be biased against approval of claims. Plaintiff's logic is unpersuasive on a number of grounds. First, it assumes that GPC desires the denial of a participant's claims for long term benefits. Nonetheless, it is just as believable to presume that GPC recognizes its employees are valuable assets, knows that employees do not want to work for an unfair employer and desires that disability benefits be paid according to the terms of the Plan. Furthermore, Plaintiff's logic assumes that Met-Life "knows" of GPC's purported desire to shaft its employees. The mere existence of a contractual

arrangement between GPC and Met-Life, however, is wholly insufficient to support such an assumption.

Finally, Plaintiff's logic assumes[4] that Met-Life would, in fact, carry out GPC's bidding to be biased against payment of claims. While corporation bashing is popular, and sometimes justified, it ignores the basic fact that most corporations, although undeniably profit seeking, try to do the right thing for the right reasons most of the time. Simply put, neither employees, nor customers, nor vendors want to deal with an unfair or crooked company. Long term profit making is best assured through fairness and compliance with legal duties. No evidence is present in the record to show that GPC or Met-Life were anything but fair in their treatment of Plaintiff.

In any event, if Met-Life was only interested in short term profit, it would rarely deny a claim. As is evidenced by the present case, a TPA obviously incurs far more employee work hours when denying a claim rather than simply approving it. Thus, a TPA's employees would arguably be able to handle a larger volume of claims if they simply approved them, or the TPA would be able to do the same amount of claims with fewer employees. When the TPA is working for a flat fee, such a procedure likely would be more profitable than the

---

[4] Plaintiff could, with some justification, bemoan the fact that he is reduced to simply assuming these matters because discovery is not permitted in claims for ERISA benefits. Nevertheless, the Court sees the purpose in prohibiting such discovery (a relatively speedy appellate review on the record) to outweigh the benefit of the costly process of deposing each claims processor and medical reviewer in hopes of uncovering bias against the payment of claims.

9

arduous process of exhaustively documenting a claim denial, incurring fees for independent medical reviews and then getting sued to boot.

## II. Contentions of Arbitrary and Capricious Behavior

Plaintiff complains that Met-Life's actions were arbitrary and capricious because it failed, in a variety of ways, to properly document or include in the Administrative Record a number of factors Plaintiff considers (but Met-Life does not) to be important in determining his level of disability. This case therefore demonstrates the tension between the Plan provisions requiring a participant to provide proof of disability, the legal requirement that an administrator conduct an adequate investigation and compile a reasonably completed administrative record, and a Plaintiff's burden of proving the administrator acted arbitrarily and capriciously.

As examples of Met-Life's purportedly lackadaisical investigation, Plaintiff points primarily to certain medical records that allegedly were not provided to the independent medical reviewers. Plaintiff asserts Met-Life gave insufficient attention to his carpal tunnel and ulnar nerve transposition condition surgery in making its determination. Nevertheless, Met-Life correctly points out that Plaintiff never specifically alleged this condition as a basis for an alleged inability to work. The physician who performed the surgery fully and completely released Plaintiff to return to work. While Plaintiff was deemed twelve percent impaired in each arm for workers' compensation purposes, this is a far cry from being totally disabled.

Plaintiff also complains that Met-Life failed to obtain certain records from his back surgeon for inclusion in the Administrative Record. A review of the record shows, however, that such records are, in fact, present. Indeed, a September 29, 2003 record from this surgeon indicates Plaintiff is "completely neurologically intact."

Plaintiff further complains that certain operative reports (e.g., from his ulnar surgery and lumbar fusion surgery) were contained in the Administrative Record but not provided to the independent medical reviewers. The Court has reviewed the surgical reports at issue and cannot understand their ultimate relevance to the determination of disability. None of the operative reports contain any mention of untoward events occurring during surgery or complications immediately thereafter. Basically, they seem like run-of-the-mill operative reports. Plaintiff himself does not explain exactly what relevance the operative reports may have to a determination of disability.

Finally, Plaintiff complains that Met-Life disregarded the opinions of his treating physicians and leaned too heavily on the opinions of its independent medical reviewers, who are tainted by "bias and unfair prejudice." As an administrator, Met-Life is, of course, not required to defer to the decisions of treating physicians. Black and Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003). Indisputably, Met-Life did, in fact, consider the opinions of Plaintiff's treating physicians. Furthermore, no evidence exists from which to adduce that the board certified physicians reviewing Plaintiff's claim on behalf of Met-Life were in any

11

way biased or unfairly prejudiced against the Plaintiff, other than the fact that they opined the Plaintiff was not disabled. Instead, Plaintiff relies on caricature.

A caricature is a distorted image of a person with the exaggeration of features or mannerisms for satirical effect. Thus, caricatures can, in certain circumstances, have some grounding in reality. Plaintiff caricatures the various physicians involved in his claim for benefits as follows: the board certified physicians retained by Met-Life are prejudiced shills willing to prostitute themselves for the insurance company that retains them. Plaintiff's treating physicians, on the other hand, are saints in surgical garb.

The Court certainly understands and agrees with the proposition that a retained expert, whether medical or otherwise, may need to be viewed with a certain skepticism. Conversely, there is simply no reason why a treating physician's opinion must be considered infallible. As recognized in Maniatty v. UnumProvident Corporation, 218 F.Supp.2d 500, 504 (S.D.N.Y. 2002), it is not "unreasonable for the administrator to conclude that the only material reason the treating physicians are reaching their diagnoses was based on their acceptance of Plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator." In short, treating physicians are certainly inclined to believe their patient's subjective complaints, at the least, because of natural professional empathy.

A treating physician may, however, conceivably be biased for the same reason as those physicians retained by an insurance company. After all, treating physicians are paid

by the patient. A treating physician's livelihood may often hinge on a continuing relationship with his patients – a relationship that may very well rest upon (or be reinforced by) the physician making findings desired by the patient. The Court is certainly not suggesting that any of Plaintiff's treating physicians succumbed to such temptation. Rather, the Court simply reflects that all human beings are susceptible to the lure of lucre, and the charge of financial bias can be leveled (whether or not accurately) by both sides. The Court prefers to look at the substance of the medical opinions and their apparent soundness. Doctors may, and often do, disagree. That is what seems to have occurred in the present case.

The tension previously mentioned between a plaintiff being "master of his claim" in proving the administrator was arbitrary and capricious and the administrator's duty to investigate and compile an administrative record should be solved as follows: an administrator must solicit information regarding a claim from the participant. The administrator must be open to accepting any information from the participant. Everything submitted by the participant must be included in the administrative record and actually reviewed and considered by the administrator. The administrator has a duty to remind the participant of unfulfilled requests. More than this, the Court cannot require, except on an ad hoc basis.

An administrator needs to compile a reasonably complete administrative record. This does not mean, however, that the record must be perfect or that the administrator's investigation can never be subject to critique. For example, having an independent physician

actually examine a participant claiming disability is probably the "best" possible approach. Nevertheless, such an independent medical examination cannot be required in every claim, or even most claims. Conversely, by not requiring such an examination, the administrator runs the risk that, in a particular case, its denial of benefits will be found to be arbitrary and capricious. This is not one of those cases.

### III. Substantial Evidence Supports the Claim Denial

Throughout the course of its consideration of Plaintiff's disability claim, Met-Life sought and reviewed Plaintiff's medical records, submitted them for analysis, and kept Plaintiff informed of the process. Plaintiff originally submitted the claim for disability due to medical problems associated with a tick bite. These problems resolved but apparently evolved into back problems and other conditions. His back surgery was pronounced successful, despite his continued subjective back pain. Furthermore, although Plaintiff had neuropathy resulting from diabetes and some impairment in his arms, he had been released to return to work following his ulnar nerve surgery. Furthermore, his diabetes and hypertension appeared to be under control. Plaintiff's records were reviewed three times by an independent physician board certified in Infectious Diseases and Internal Medicine. The Functional Capacity Evaluation demonstrated that he had the ability to perform a medium classification position for an eight hour day. His occupation as a rewind operator met this classification. When Plaintiff appealed Met-Life's decision, a second board certified physician specializing in Preventive and Occupational Medicine reviewed the records and

14

determined that Plaintiff was not disabled and was physically capable of performing medium duty work.

In short, substantial evidence is present in the Administrative Record to support Met-Life's determination that Plaintiff does not meet the criteria for receiving own-occ benefits. While perhaps reaching a different result under de novo review, the Court will not in the present case second-guess the discretion of the administrator whose expertise and experience in determining disability far surpasses its own.

## **CONCLUSION**

Because of the lack of a conflict of interest, Met-Life's decision is entitled to the pure arbitrary and capricious standard of review. Plaintiff's criticisms of Met-Life's actions and decision, while very well presented, are not sufficiently persuasive to compel the Court to find Met-Life's decision was arbitrary and capricious. Therefore, the decision denying benefits is sustained and Plaintiff's claim for benefits is denied.

Dated this 28th day of April, 2006.

_____
Ronald A. White
United States District Judge
Eastern District of Oklahoma